UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| NATALIE D. SIMMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:18-CV-00211 |
| | § | |
| CITY OF SAN ANTONIO, TEXAS; | § | |
| and MARA LYNN WILSON, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

San Antonio Police Department Detective Mara Wilson, without a warrant and against clearly-established law, conducted a vaginal cavity search of Natalie Simms, on a public street, in view of male police officers and others in the area. This was a blatant violation of Ms. Simms' constitutional rights and resulted in significant and lasting harm.



Table of Contents

I.  Introductory Allegations ................................................................. 3

    A.  Parties ............................................................................... 3

    B.  Jurisdiction ........................................................................ 4

    C.  Venue ................................................................................ 5

II.  Factual Allegations ..................................................................... 5

    A.  Introduction ....................................................................... 5

    B.  Natalie Simms ..................................................................... 5

    C.  Vaginal Cavity Search of Natalie on Public Street ....................... 6

    D.  Officer Wilson Complains About Acting Honorably .................... 15

    E.  *Monell* Liability .................................................................. 17

        1.  The City Ratified Officer Wilson's Actions ....................... 17

        2.  The City's Policies Regarding Field Searches Are Ineffective .......... 19

        3.  The City's Officers' Comments and Actions Demonstrated the City's Widespread Custom, Practice, and/or Policy ...................................... 19

        4.  The City's Policy Demonstrated Through Prior Uses of Excessive Force ......................................................................... 21

III.  Causes of Action ...................................................................... 21

    A.  Cause of Action Against Mara Lynn Wilson Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights .......................................... 21

    B.  Cause of Action Against City of San Antonio Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights .......................................... 23

IV.  Concluding Allegations ............................................................... 24

    A.  Conditions Precedent .......................................................... 24

    B.  Use of Documents ............................................................... 24

    C.  Jury Demand ..................................................................... 24

    D.  Prayer .............................................................................. 24

TO THE HONORABLE UNITED STATES DISTRICT COURT:

The Plaintiff files this complaint and for cause of action will show the following.

I.      Introductory Allegations

        A.      Parties

        1.      Plaintiff Natalie D. Simms ("Ms. Simms" or "Natalie") is a natural person who resides and did reside in Texas at all relevant times.

        2.      Defendant City of San Antonio, Texas ("San Antonio" or the "City") is a Texas incorporated municipality / city.  San Antonio may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer.  The identity of San Antonio's chief executive officer is determined by San Antonio's decision to use the council-manager form of government.  As a result, San Antonio's chief executive officer is City Manager Shelly Scully.  City Manager Sheryl Sculley may be served with process at City Hall, 100 Military Plaza, San Antonio, Texas 78205, or wherever she may be found.  San Antonio may also be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving it in the manner prescribed by Texas State law for serving a summons or like process (a citation in Texas State courts) on such a Defendant.  Texas Civil Practice and Remedies Code 17.024(b) reads, "In a suit against an incorporated city, town, or village, citation may be served on the mayor, clerk, secretary, or treasurer.  Therefore, San Antonio may also be served with process by serving its mayor, clerk, secretary, or treasurer wherever such persons may be found.  San Antonio acted or failed to act at all relevant times through its policy makers, chief policy makers, employees, agents, representatives, and/or police officers and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).

3.      Defendant Mara Lynn Wilson ("Officer Wilson," "Detective Wilson," or "Ms. Wilson") is a natural person who resides at and may be served with process at 5902 Pearl Pass, San Antonio, Texas 78222.  Ms. Wilson may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Wilson at Ms. Wilson's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Wilson is being sued in her individual capacity and acted at all relevant times under color of state law.  Ms. Wilson was employed by and/or was the agent and/or designee and/or contractor of and for San Antonio at all such times and acted or failed to act in the course and scope of her duties for San Antonio.

B.      Jurisdiction

4.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights.  This suit arises under the United States Constitution and a federal statute including but not necessarily limited to 42 U.S.C. § 1983.  The Plaintiff does not, by including the following sentence, assert, stipulate to, or allege any state law claims.  However, to the extent any such claims are alleged or construed to be alleged in this pleading, the court has supplemental jurisdiction over any such claims pursuant to 28 U.S.C. § 1367(a) due to them being so related to the claims within the court's original jurisdiction that they and the claims within the court's original jurisdiction arise from a common nucleus of operative fact and form part of the same case or controversy under Article III of the United States Constitution.

5.    The court has personal jurisdiction over San Antonio because it is a Texas municipality.  The court has personal jurisdiction over the natural person Defendant because she resides in and is a citizen of Texas.

C.    Venue

6.    Venue is proper in the San Antonio Division of the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(2), because it is the division in the district in which a substantial part of the events or omissions giving rise to claims asserted in this pleading occurred.

II.    Factual Allegations

A.    Introduction

7.    The Plaintiff provides in the factual allegations sections below the general substance of certain factual allegations.  The Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, the Plaintiff intends that those sections provide the Defendants sufficient fair notice of the general nature and substance of the Plaintiff's allegations, and further demonstrate that the Plaintiff's claim(s) have facial plausibility.  Whenever the Plaintiff pleads factual allegations "upon information and belief," the Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

B.    Natalie Simms

8.    Natalie Simms was born in Fort Worth, Texas, and she is in her late 30s.  She attended Sam Houston High School and completed the General Education Development ("GED") exam.  Natalie currently lives in San Antonio.

C.     Vaginal Cavity Search of Natalie on Public Street

9.     On or about August 8, 2016, Natalie was sitting on a curb on a public side-street in San Antonio, talking on her phone, waiting for her boyfriend.  She had driven to the location in a vehicle which was parked across the side-street from where she was sitting.  Natalie possessed nothing illegal.  There was nothing in the car that Natalie had driven that was illegal to possess. Even so, San Antonio police officers appeared at the scene and alleged that they believed that Natalie might possess illegal drugs.

10.    Police officers asked Natalie whether they could search the vehicle.  Natalie, knowing that she had done nothing wrong, consented to that search.  Natalie was detained and unable to leave, and she believed that she could not leave unless and until she was allowed to do so by a San Antonio police officer at the scene.  Uniformed and, upon information and belief, non-uniformed San Antonio police officers, through their words and actions, caused this belief. Further, upon information and belief, Natalie would not be allowed to leave the scene unless and until she and the vehicle she had driven to the scene were searched.

11.    One or more San Antonio police officers asked for a female officer to come to the scene and search Natalie.  Female Defendant Detective Mara Wilson drove to the scene.  Natalie believed that she was not free to go, must be searched, and would not be allowed to leave the scene unless and until Officer Wilson searched her.

12.    Officer Wilson began to search Natalie, and one visual perspective of the search was recorded by a dash cam in Officer Wilson's San Antonio Police Department vehicle.  The quotations below, in this section of the complaint, were in substance taken from that recording and are presented in the order in which events occurred and comments were made.

| Officer Wilson: | Do you have anything on you? |
| Natalie: | No, ma'am, nothing. |
| Officer Wilson: | Okay.  So what do we have on here?  What is this? |

| | |
|---|---|
| Natalie: | It's a little pocket.  These are my workout clothes. |
| Officer Wilson: | Uh-huh. |
| Natalie: | And that's it. |
| Officer Wilson: | Okay.  And these -- |
| Natalie: | That's a regular pocket. |
| Officer Wilson: | This white stuff, what is this? |
| Natalie: | It's just the shorts. |
| Officer Wilson: | Oh, these are shorts? |
| Natalie: | Yes. |
| Officer Wilson: | Okay.  So I can pull these down?  They're not underwear, though, right?  They're shorts, right? |
| Natalie: | Yes, ma'am. |
| Officer Wilson: | Okay.  Just wondering.  If you've got pockets where I can . . . |

13.     Officer Wilson evidenced her understanding, through her own words, at the virtual beginning of the search, that she could not constitutionally strip search Natalie, on a public street, and in view of other male police officers, a person detained across the street, and people driving by.  Officer Wilson orally expressed her concern about pulling down an item of clothing – if it was underwear.  She asked whether she could pull it down.  She then asked, before receiving a response to her question, a second question to assure that the item of clothing was not underwear.  She then asked a third question, even before receiving responses to her first two questions, to assure herself that the item of clothing was not underwear.  The fact that she asked three questions in a row, before receiving an answer, was an aural display of what was going on in Officer Wilson's own mind – concern about whether what she intended to do was constitutional.

14.     Officer Wilson knew that she could not expose Natalie's pubic hair, vagina, or other parts of her body which are so intimate as to be covered up regularly in public.  Unfortunately, Officer Wilson's knowledge was no concern to her and did not guide her search.  Officer Wilson instead chose to culminate her search by conducting a vaginal cavity search.

15.     Officer Wilson, when continuing the search, asked Natalie questions which had nothing to do with the search.

| | |
|---|---|
| Officer Wilson: | What kind of work do you do? |
| Natalie: | I work at Milan. |
| Officer Wilson: | Where at? |
| Natalie: | Milan. |
| Officer Wilson: | Milan as in -- |
| Natalie: | Hair.   Hair. |

Officer Wilson was initially talking as if she were sitting down and having a cup of coffee with Natalie.  Unfortunately, this was not a meeting over coffee, and Officer Wilson's decision as to how to conduct the search was about to take a turn for the worse.  Officer Wilson told Natalie to turn and face Officer Wilson.  Natalie had no idea what was coming next.

| | |
|---|---|
| Officer Wilson: | Uh-huh.  Okay.  And then the (inaudible).  So you got shorts, you got chones and you got sweats.  All right.  Turn and face me.  So where are y'all on your way to? |
| Natalie: | I was waiting on my boyfriend. . . . |
| Officer Wilson: | Over here? |
| Natalie: | Yes, ma'am. |
| Officer Wilson: | Okay.  So this is -- |
| Natalie: | Yes. |

16.     Officer Wilson then chose to extend the search to what was, according to clearly-established law, unconstitutional.  Officer Wilson showed deliberate indifference and conscious disregard for Natalie's constitutional rights, and she acted in an objectively unreasonable manner.  The search was also to be conducted in a manner to which Natalie clearly had not consented.

| | |
|---|---|
| Officer Wilson: | Stand up straight.  Kind of lean back a little bit.  (Inaudible.)  This is -- these are shorts?  Oh, it's a skirt-short? |
| Natalie: | Yes. |
| Officer Wilson: | Oh, hell.  Okay.  Look straight ahead, okay.  Spread your legs.  I'm gonna ask you, do you have anything down here before I reach down here? |
| Natalie: | No.  I don't have nothing in my -- |
| Officer Wilson: | Okay. |

17.     Natalie began to realize, with shock, what Officer Wilson intended to do.  Officer Wilson intended to reach down into Natalie's pants and made contact with her pubic hair and vagina.

| | |
|---|---|
| Natalie: | You're gonna reach in my – |
| Officer Wilson: | I'm not gonna reach.  I'm just gonna look, but you keep, you keep flinching and everything. |
| Natalie: | I'm not -- yeah, because I'm on my cycle. |

18.     Officer Wilson blatantly lied to Natalie, so that she could do what she wanted to do.  She lied to Natalie, telling Natalie that she was not going to reach into her pants, but instead just "look."  Natalie had not consented to a "look," which would have also been unconstitutional and objectively unreasonable.

19.     Natalie's desire not to be searched in that manner was clear from her words and from what Officer Wilson verbally acknowledged was "flinching and everything."  Natalie, embarrassed and reasonably believing that she could not leave or stop the search, and was not free to leave, complained in as respectful a manner as she could considering the situation.  Upon information and belief, there were five other police officers at the scene – all of whom were male.  Natalie was aware of their presence, and more than one of them were searching Natalie's car.  Natalie believed that they could take whatever action they chose to take.  More than one of them, and possibly all of them, had weapons, and they all acted under color of state law.  They were authority figures to Natalie, to whom she reasonably believed she owed the obligation to comply with their requests and instruction not to leave unless and until they completed the searches.  This belief arose from the police officers' words, actions, and posture.

20.     Despite Natalie's respectful complaint, Officer Wilson was undeterred.  She pulled open Natalie's pants and underwear and used her flashlight to look at the area around and including that covered by pubic hair and a portion of Natalie's vagina.  Disgustingly, and in clear violation

of Natalie's constitutional rights, Officer Wilson chose to reach into Natalie's pants and pull the string attached to a tampon which was present in Natalie's vaginal cavity. Officer Wilson did so knowing that Natalie was on her period, and also knowing and seeing that Natalie had a menstrual pad in place.



21.     Officer Wilson knew that the string was attached to a tampon. Moreover, upon information and belief, Officer Wilson had been on her menstrual cycle numerous times during her life. Upon information and belief, if Officer Wilson was not ill and/or did not have issues related to having a menstrual cycle, she had likely dealt with being on her menstrual cycle at least 400 to 500 times. Thus, she was very familiar with what a menstrual pad looked like, both new and after being in place and used for a period of time, as well as what a tampon and attached string looked like, both new and after being in place and used for a period of time. Officer Wilson was not confused at all about what she saw when she chose to shine her flashlight into – and ultimately

thrust her hand into – the part of Natalie's body which was most intimate.   Natalie had not

consented to such a search, seizure, and/or use of force.   Moreover, the search and seizure were

objectively unreasonable.

| | |
|---|---|
| Officer Wilson: | Uh-huh.  Are you wearing a tampon, too? |
| Natalie: | Yes. |
| Officer Wilson: | Okay.  I just want to make sure that's what it is. Is that a tampon? |
| Natalie: | Come on.  Yes. |
| Officer Wilson: | Huh?  Is that a tampon? |
| Natalie: | It's full of blood, right?  Why would you do that? |

22.     Natalie was shocked.  She could not believe that a police officer, who was supposed

to protect and serve, violated her in such an intimate way.

23.     Officer Wilson held the tampon up in the air for approximately 23 seconds, asking

rhetorical questions and making statements about the tampon.   Upon information and belief, she

held it in a manner that it could be viewed by at least one or more male officers at the scene.

Officer Wilson was enjoying lording her power over Natalie and did not give a whit about Natalie

and/or her constitutional rights.

24.     Officer Wilson, when responding to Natalie saying that the tampon was "full of

blood," and being asked why Officer Wilson would have done that, responded, "I don't know."

What Officer Wilson really meant was, "I don't care."

| | |
|---|---|
| Officer Wilson: | I don't know.  It looked like it had stuff in there. |
| Natalie: | There ain't nothing in there. |
| Officer Wilson: | Well, you know -- huh? |
| Natalie: | There ain't nothing in there. |
| Officer Wilson: | Ain't nothing in there?  It looks like something's in there. |
| Natalie: | Feel on it. |
| Officer Wilson: | I don't wanna feel on it. |
| Natalie: | You pulled it out. |
| Officer Wilson: | I know, but I got gloves on.  You got a pad on, so you don't have to worry.  If they have me searching you, they have a reason to believe you have something, so. |
| Natalie: | I don't have anything. |

25.     Amazingly, Officer Wilson told Natalie that she did not "have to worry" because Natalie was wearing a menstrual pad in addition to the tampon.  But Officer Wilson was not finished.  She decided to continue searching the exterior of Natalie's vagina even after searching Natalie's vaginal cavity.  She decided at one point to run her fingers along Natalie's vaginal lips. She even commented on the amount of pubic hair on Natalie's body.  She continued asking Natalie about her clothing, feigning concern about Natalie's privacy after having conducted a vaginal cavity search.

26.     Officer Wilson did not apologize, say that she had made a mistake, or express any remorse whatsoever about the manner in which she had violated Natalie.  She frankly did not care. She further confirmed that Natalie was not free to move, and that Officer Wilson could chose to violate Natalie in any manner she chose.  She did so in part by telling Natalie, when searching Natalie, that Natalie needed to "be still" and not move.

| Officer Wilson: | Okay.  Well, when I search, then you be still and you don't move, then, okay.  All right.  Now, either you're very, you're very hairy, or what's all this down in there? |
| Natalie: | I got a lot of hair on me. |
| Officer Wilson: | Oh, girl.  This little outfit you got on is killing me and -- |
| Natalie: | It's tight.  These shorts, they're like panties. |
| Officer Wilson: | Uh-huh.  And this is a -- what is this, a little -- Is that a little rope? |
| Natalie: | It's a skort. |
| Officer Wilson: | Is that a skirt? |
| Natalie: | Yes, ma'am. |
| Officer Wilson: | Turn and face this way.  I don't want you facing them where they can see you.  And spread your legs.  Turn back to the car and spread again. Hold on. |

27.     Officer Wilson had violated Natalie vaginally, and now it appeared that she might violate Natalie anally.  She was doing so without a warrant, with no medical personnel present, and on a public street in view of several people as well as those passing by.  Officer Wilson began

to reach down in a manner indicating that she intended to search between Natalie's buttocks and

potentially engage in an anal cavity search.  Natalie, in her continued shock and protest, responded.

| | |
|---|---|
| Natalie: | Why are you searching me like that out here? |
| Officer Wilson: | I have to check your back, because -- |
| Natalie: | No. We can go to the station to do that. |
| Officer Wilson: | I ain't going nowhere.  I'm gonna search you right here. |
| Natalie: | But, Miss, this is like in public.  Come on now.  You already pulled the tampon out. |
| Officer Wilson: | Yeah, I know, but turn around. |

28.     Officer Wilson showed no concern for Natalie's privacy and no concern for her

constitutional rights.  Officer Wilson, after completing the vaginal cavity search, continued forcing

herself on Natalie and said, "I ain't going nowhere.  I'm gonna search you right here."  Officer

Wilson believed that she was above the law.  Natalie was helpless, and she could not leave until

Officer Wilson finished doing what she chose to do.

29.     Officer Wilson's lack of concern for Natalie's privacy and constitutional rights was

further evidenced by her telling Natalie that, as long as she did not possess any illegal substance,

she had nothing to worry about.  One wonders whether, if a police officer were searching Officer

Wilson in the same manner that she searched Natalie, whether Officer Wilson would agree that

Officer Wilson would have nothing to worry about regarding the search.

30.     If Officer Wilson's assertion were true, members of the public could be searched

by police officers, at will, in malls, theaters, shopping centers, and grocery stores, and even the

tourist-busy San Antonio River Walk, and the searches could include body cavity searches.  As

long as such citizens had no illegal contraband on them, according to Officer Wilson, they should

have nothing to worry about regarding such body cavity searches.  Fortunately, this is untrue in

the United States, because its citizens are protected by its constitution.

| | |
|---|---|
| Natalie: | I don't have nothing – |
| Officer Wilson: | If you don't have anything, you don't have anything to worry about, okay, but these are all the places that everybody hides stuff, so this is where we have to search. |

31.     Natalie complained again about the forced search and asked why Officer Wilson did it in a public place.  She asked that it be done at the police station.  Officer Wilson, continuing her punishment and unreasonable treatment of Natalie, who did nothing wrong, gave a sarcastic and snarky retort to Natalie's more-than-reasonable request.

| | |
|---|---|
| Natalie: | I know, but why are we doing this out here?  Can't we go to the station? |
| Officer Wilson: | What station? |
| Natalie: | The police station. |
| Officer Wilson: | Which one?  We got a whole bunch of them. |
| Natalie: | Thank you.  I told you. |

32.     Officer Wilson enjoyed her display of power.  She enjoyed wearing a police uniform, using her rubber gloves, and forcing a vaginal search of Natalie in public, backed up by, upon information and belief, five male police officers.  She enjoyed sarcastically responding to Natalie, when Natalie simply asked for the human dignity afforded to all citizens of the United States pursuant to its constitution.  Officer Wilson's actions and comment were a disgusting display of what can happen with unchecked power.

33.     Conversation during the conclusion of the search further evidenced that the search was not consensual.  Officer Wilson instructed Natalie when she was allowed to put her hands down.

| | |
|---|---|
| Officer Wilson: | Well, everybody tells us everything -- |
| Natalie: | Yes, ma'am. |
| Officer Wilson: | -- but we still have to search you, okay? |
| Natalie: | Yes, ma'am.  Yes, ma'am. |
| Officer Wilson: | You can put your hands down. |

34.     Officer Wilson then asked one or more other officers in substance what Natalie was to do.  One other officer directed Natalie as to what she was to do.  Words spoken, together with body language of Officer Wilson and the other officer, clearly demonstrated that Natalie was still not free to leave.  She was not able to do so unless and until the officers allowed her to leave the scene.

35.     After Natalie had been violated, she was allowed to drive away from the scene, in the vehicle in which she arrived.  Officers did not find anything illegal, after searching her car and searching her.  Even though Natalie was allowed to leave the scene, a part of her dignity and self-worth was left behind.  Officer Wilson's actions and inaction caused, proximately caused, and were the producing cause of damages suffered by Natalie.

### D.     Officer Wilson Complains About Acting Honorably

36.     One would think that Officer Wilson, just after such a patently impermissible search, seizure, and use of force, would express to a fellow officer that she had not acted properly and constitutionally.  One would hope that she would show remorse, or admit that she should not have done what she did.  Not so with Officer Wilson.  The following conversation occurred between Officer Wilson and, upon information and belief, Detective Larios.

> Detective Larios:     Hey, Mira.
> Officer Wilson:       Oh, yeah.  Because I'm searching everything.  And she's got a tampon on, and I pulled the string and pulled everything out.  It was really nasty, but I just wanted to make sure there wasn't anything in there.

37.     Officer Wilson acknowledged to her fellow San Antonio police officer that she knew that she had pulled a string on a tampon, and that it "was really nasty," but that she "just wanted to make sure there wasn't anything in there."  Officer Wilson thus admitted that she knew

that she was conducting a vaginal cavity search through pulling out the tampon. Detective Larios

was disgusted and shocked, seeing the used tampon on the bumper of the police vehicle.

| | |
|---|---|
| Detective Larios: | That right there? |
| Officer Wilson: | Heck yeah. |
| Detective Larios: | Oh, shit. |
| Officer Wilson: | What, that scares you? |
| Detective Larios: | Hell, no, it don't scare me, but goddamn. |

38.     Officer Wilson once again admitted that she knew she was conducting a cavity

search. She needed to, in her mind, conduct a cavity search on a public street because "they stick

all kinds of stuff . . . ." She also decided to throw the tampon away, thus destroying evidence, and

leaving Natalie without the ability to control the effects of her period.

| | |
|---|---|
| Officer Wilson: | But you don't know what they have. I mean, they stick all kinds of stuff, so I'm gonna put it in my glove and throw it away, but just so you see. |
| Detective Larios: | Yeah. I thought you were picking out – picking some rocks out. I didn't know it was gonna be that. |

Officer Wilson then turned to what she was really concerned about – herself.

| | |
|---|---|
| Officer Wilson: | Oh. |
| Detective Larios: | How have you been? |
| Officer Wilson: | I've been good. You know, what's his name? Marco told me that today – he said, how much longer? He said, I'm at 40 years. Yeah. I said, you know, that's not even funny. But you know, I'm really serious. And now I was gonna go September 30th of '18, but I'm, I'm looking at next year, because I'm tired. |
| Detective Larios: | Yeah. |

39.     Officer Wilson then expressed her dismay at the fact that police officers had to treat

people appropriately, and that there would be at times video recordings of the manner in which

people were treated. Fortunately, there was a recording of how Officer Wilson chose to treat

Natalie.

| | |
|---|---|
| Officer Wilson: | And this too much stuff. It's just all this stuff, re-doing everything, and you know, the body cams, and do this. |

| Detective Larios: | I want to see the officers getting all the – putting all the discretion on the police. |
| Officer Wilson: | I know. Can't do anything, can't say anything to anybody. You can't look at anybody wrong. |
| Detective Larios: | Yeah. |
| Officer Wilson: | You know, and nowadays everybody's kissing up to everybody so they can get ahead. |
| Detective Larios: | I don't know. I just wonder when it changed, you know. Everything's just like (inaudible). |
| Officer Wilson: | Yeah. |

### E.    *Monell* Liability

40.    The City of San Antonio is liable for all damages suffered by Ms. Simms and referenced in this pleading pursuant to *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978) and its progeny. Such liability arises due to the action and/or inaction of the chief policymaker for the City of San Antonio regarding material issues in this case. The chief policymaker was the chief of police at all relevant times. The City's action and inaction otherwise referenced in this pleading, related to damages suffered by Natalie, and its policies, procedures, practices, and/or customs, were the moving force behind, and resulted in, the referenced constitutional violations and damages suffered by Natalie as a result.

#### 1.    The City Ratified Officer Wilson's Actions

41.    The City has *Monell* liability due to, upon information and belief, its failure to sufficiently discipline Officer Wilson as a result of the unconstitutional search, seizure, and use of force. Upon information and belief, Officer Wilson was not given any time off without pay or, in the alternative, any time off without pay was *de minimis* or negligible as compared to the offensive conduct in which she engaged. The City had copies of all relevant video recordings, including those transcribed above, and thus had plenty of evidence from which to determine that Officer Wilson should have been terminated.

42.     A City attorney wrote to the Office of the Attorney General and represented that Officer Wilson "did not receive a suspension of one day or more."  Upon information and belief, the City primarily simply made a notation in Officer Wilson's personnel file for, in the words of Chief of Police William P. McManus, it would "serve as a reference in the event there [was] a reoccurrence of [that] type of action by the officer."   Chief McManus was the City's chief policymaker at the time he wrote the letter on January 3, 2017 regarding occurrences at issue in this case.  The fact that the letter was written many months after the occurrence is further evidence that the City did not take seriously the blatant and unwarranted constitutional violation committed by Officer Wilson.   In fact, in an annual evaluation report regarding Officer Wilson dated approximately two weeks later – January 16, 2017 – the City of San Antonio Police Department reviewer indicated that, regarding laws/policies/procedures (relating to demonstrating knowledge of federal, state, and local laws as they relate to law enforcement and in keeping with the mandates and guidelines of the San Antonio Police Department), Officer Wilson met expectations. Moreover, even after conducting the constitutionally-impermissible body cavity search of Natalie, the same San Antonio reviewer indicated that Officer Wilson's overall performance "Exceeds Expectations."  Thus, the City of San Antonio and its police department rewarded Officer Wilson for her conduct, by giving her the highest rating available regarding her overall performance.

43.     Officer Wilson was allowed to retire, upon information and belief, without any further repercussions from the City, on or about May 1, 2017.  The City ratified Officer Wilson's conduct and would not take appropriate action unless another person suffered from a "reoccurrence of [that] type of action by the officer."  In other words, at least one more person would have to undergo a body cavity search, in a public area in San Antonio, before the city would terminate Officer Wilson.  That other person could be anyone – someone on vacation in San Antonio eating

on the River Walk or any resident of San Antonio. The City's ratification of Officer Wilson's conduct was a moving force behind, and a proximate and producing cause of, Natalie's damages.

### 2.    The City's Policies Regarding Field Searches Are Ineffective

44.     The City also had in place ineffective policies regarding conducting field searches of people without a warrant. Upon information and belief, the City's Warrantless Search Authorities/Guidelines did not include any guidance whatsoever as to whether and how to conduct strip and/or body cavity searches. This ineffective policy was a moving force behind, and a proximate and producing cause of, Natalie's damages.

### 3.    The City's Officers' Comments and Actions Demonstrated the City's Widespread Custom, Practice, and/or Policy

45.     The manner in which Officer Wilson conducted the search with, upon information and belief, five other male police officers at the scene, with no objection by those officers, indicates that such a search is part of the typical manner in which the San Antonio Police Department does business. This view was confirmed by comments made by police officers after the search, and after having full knowledge of what occurred.

46.     Officer Robert Larios told a Detective Valadez, pursuant to an Internal Affairs investigation, "I know I didn't do anything wrong. I don't think Myra [sic] did anything wrong you know." There was no mistake about what Officer Larios said, because he said another time during the same interview, "I don't think Myra [sic] did anything wrong." Officer Larios did not like the interview, stating, "I feel like I'm on 48 Hours." Further, another comment made by Officer Larios during his interview indicated that, while the search may have been unpleasant, it was typical.

> It was kind of dark, although there was lighting. And I didn't what it was, and I was like, what's that? I think I asked, what's that, or I looked at it puzzling. And she was like, it's her tampon. And I kind of made like – I grimaced or something,

because I, I mean, I thought that was gross. And so that was it. And I said, okay, you know.

Officer Larios thought the search was "gross," but he thought nothing was wrong with it. One wonders how many other searches Officer Larios had seen of a similar type.

47. Officer Larios also told Detective Valadez that "everything was, was handled, in my opinion, by the book." He further at that time also said again, "Myra [sic] didn't do anything wrong." Despite Officer Larios indicating that Officer Wilson was acting "by the book," apparently indicating that she acted consistent with policy, practice, custom, and/or procedure of the City of San Antonio, he told Detective Valadez, "I never indicated to do a cavity search . . . ."

48. Officer Jack Harper, in his interview with Detective Valadez, also implicitly confirmed that the search, seizure, and use of force was consistent with San Antonio Police Department policy, procedure, custom, and practice. Officer Harper, apparently referencing Natalie complaining about the manner in which she was being searched, looked over at Natalie and Officer Wilson at some point because he wanted to know "what the fuss was all about, why she was getting loud." After the search, Natalie told Officer Harper that Officer Wilson had "pulled [her] tampon." Specifically, Officer Harper said that Natalie said, "She pulled my tampon." Officer Harper, demonstrating his complete lack of concern for such an occurrence and, more importantly for purposes of this pleading, the apparent practice, policy, procedure, and custom of the City of San Antonio, responded to Detective Valadez, "And I was like, alright. And then she sat down, and we just started talking about random stuff." Officer Harper acted like the search, seizure, and use of force was typical practice in the field. Upon information and belief, it was.

#### 4.     The City's Policy Demonstrated Through Prior Uses of Excessive Force

49.     The City had been sued numerous times prior to choosing to search, seize, and use excessive force on Natalie.  Upon information and belief, many allegations in those lawsuits were potentially true and/or, at the very least, put the City on notice that it had an issue regarding its police officers using excessive force.  The City's failure to take appropriate action regarding the use of excessive force was a moving force behind, and a proximate and producing cause of, Natalie's damages.

### III.     Causes of Action

#### A.     Cause of Action Against Mara Lynn Wilson Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights

50.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant Mara Lynn Wilson is liable to the Plaintiff, pursuant to 42 U.S.C. § 1983, for violating the Plaintiff's rights guaranteed by the Fourth Amendment alone, and/or in addition and/or in the alternative as the Fourth Amendment has been incorporated to be applied to the states pursuant to the Fourteenth Amendment.  Officer Wilson acted and failed to act under color of state law at all times referenced in this pleading.  Officer Wilson was deliberately indifferent to the Plaintiff's constitutional rights, and she acted in an objectively unreasonable manner when seizing, searching, and using force with Natalie.  She exercised constitutionally impermissible excessive force.  Officer Wilson violated clearly established constitutional rights, and her conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents.

51.     It was clearly established law that Officer Wilson could not conduct a strip search, body cavity search, and/or other search, seizure, and force described above in a public place, including but not limited to on a public street.  It was clearly established law at the time of the incident that any such search and seizure could not occur without a warrant and, even if it could occur after securing a warrant, it had to occur in private and be conducted by medical personnel. There were no exigent circumstances requiring or allowing the search to be conducted in the manner it was, and on a public roadway.  Neither Officer Wilson or any of the other officers at the scene feared for their safety and/or had any reason to believe that Natalie possessed something that would harm any of the officers or anyone else.  Therefore, Officer Wilson is not entitled to qualified immunity.

52.     The Plaintiff seeks all remedies and damages available to her for her 42 U.S.C. § 1983 claims.  The damages suffered by the Plaintiff were caused and/or proximately caused by Officer Wilson, or in the alternative Officer Wilson's conduct was the producing cause of the Plaintiff's damages.  Therefore, the Plaintiff seeks any and all legally-available damages including but not necessarily limited to the following:

- mental anguish and emotional distress suffered in the past;

- mental anguish and emotional distress to be suffered in the future; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Natalie's constitutional rights.  Officer Wilson's actions and inaction showed a reckless or callous disregard of, or indifference to, Natalie's rights.  Moreover, the Plaintiff seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

B.  Cause of Action Against City of San Antonio Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights

53.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant City of San Antonio is liable to the Plaintiff, pursuant to 42 U.S.C. § 1983, for violating the Plaintiff's rights guaranteed by the Fourth Amendment alone, and/or in addition and/or in the alternative as the Fourth Amendment has been incorporated to apply to the states pursuant to the Fourteenth Amendment.  Officer Wilson was at all times referenced in this pleading acting in the course and scope of her duties of and for the City of San Antonio, and she was acting color of state law.  San Antonio acted or failed to act under color of state law at all relevant times.  San Antonio's customs, practices, and/or policies caused, were a proximate cause of, and/or were the producing cause of the Plaintiff's damages.  The San Antonio Chief of Police was the chief policymaker at all times relevant to this pleading, and he was the one that determined the customs, practices, and policies referenced herein.  The chief policymaker's failure to adopt, upon information and belief, policies referenced in this pleading, as well as his failure to stop customs, practices, and policies which developed and which are mentioned in this pleading, were intentional choices.   Thus, San Antonio was deliberately indifferent to, and acted in an objectively unreasonably manner regarding, Natalie's constitutional rights (as well as the rights of others who suffered Fourth Amendment violations at the hands of San Antonio police officers.)  These customs, practices, and policies were moving forces behind the violation of the Plaintiff's rights and showed deliberate indifference to the known or obvious consequences of constitutional violations.

IV.     Concluding Allegations

      A.     Conditions Precedent

54.     All conditions precedent to assertion of the Plaintiff's claims have occurred.

      B.     Use of Documents

55.     The Plaintiff intends to use at one or more pretrial proceedings, in motion practice, and/or at trial all documents produced by the Defendants in this case in response to written discovery requests.

      C.     Jury Demand

56.     The Plaintiff demands a jury trial on all issues which may be tried to a jury.

      D.     Prayer

57.     For these reasons, the Plaintiff ask that the Defendants be cited to appear and answer, and that the Plaintiff have judgment for damages within the jurisdictional limits of the court and against the Defendants, jointly and severally, as legally applicable, for:

    a)     actual damages of and for the Plaintiff for including but not necessarily limited to the following:

        • mental anguish and emotional distress suffered in the past;

        • mental anguish and emotional distress to be suffered in the future;

    b)     exemplary/punitive damages from and against Officer Wilson;

    c)     reasonable and necessary attorneys' fees for the Plaintiff through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

    d)     court costs and all other recoverable costs;

    e)     prejudgment and postjudgment interest at the highest allowable rates;  and

f)      all other relief, legal and equitable, general and special, to which the Plaintiff is entitled.

Respectfully submitted,

Law Offices of Dean Malone, P.C.


By: /s/ T. Dean Malone

T. Dean Malone
Texas State Bar No. 24003265
dean@deanmalone.com
Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:      (214) 670-9989
Telefax:        (214) 670-9904

Attorneys for the Plaintiff